## Case No. 6,699.

### HOPNER v. APPLEBY.

[5 Mason, 71.] [1]

Circuit Court, D. Rhode Island. June Term, 1828.

BILLS OF EXCHANGE—FRAUD IN PROCURING—RECOVERY.

Where a Spanish vessel was captured by a Colombian privateer, and by collusion between the captors and an American citizen she was purposely wrecked on a key on the coast of Florida, within the territory of the United States, and the cargo was there landed, and the duties regularly paid; and afterwards the cargo was sold, and the American citizen became a purchaser thereof, and gave bills of exchange drawn by himself on a house in Charleston, South Carolina, which were dishonoured; it was *held*, that the party was liable to be sued on such bills in an American court, and that the collusion between him and the captors, in procuring the shipwreck, was no bar to a recovery in such suit, as there was no fraud intended, or perpetrated on the laws of the United States.

Assumpsit on sundry bills of exchange drawn by the defendant [Joshua Appleby], payable to the plaintiff [C. C. Hopner], or order, on Thomas Street & Co. of Charleston, South Carolina, and protested for non-acceptance and non-payment. The declaration contained the usual averments. Plea, the general issue. Some of the bills were drawn at Key Vaccas, Port Monroe, on the 28th of May 1823, payable at sight, at thirty days'

[1] [Reported by William P. Mason, Esq.]

sight, and at sixty days' sight; and others, at Long Key, on the 15th of June of the same year, payable at thirty days' sight, and at sight. At the trial it appeared, that the bills of exchange were given for certain wrecked goods purchased by the defendant of the plaintiff. The plaintiff was commander of a privateer, called Le Cintella, sailing under the flag of the republic of Colombia, and in the course of his cruise he captured some Spanish vessels laden with goods, which were brought into Key Vaccas and Long Key, on the coast of Florida, and within the territorial limits of the United States, and there wrecked. The goods were duly landed, the duties thereon duly paid and secured, and afterwards sold to the defendant, who is an American citizen. The principal grounds of defence urged at the trial were, (1) that the privateer was not regularly commissioned; (2) that the wreck of the prizes was procured by collusion between the plaintiff and defendant, for the purpose of landing and selling the goods at Key Vaccas and Long Key, and to avoid the necessity of carrying the prize into the ports of Colombia, and there procuring a regular condemnation.

Searle & Hunter, for defendant, contended, that if these facts were made out, the contracts were wholly illegal. If the wreck was by collusion, it was a violation of belligerent rights and duties, and against the law of nations. Assuming the original capture to be good, still the rights acquired under it might be forfeited by misconduct. No sale could be justified in a neutral port without absolute necessity. Here it was by fraud. The prizes ought to have been carried into a port of Colombia, and a regular condemnation obtained before any title could pass under the captures.

But the privateer was not regularly commissioned, and if so, there is no pretence of a recovery. It is a mere piratical act. The conduct of the parties is strongly presumptive of fraud. The defendant was known to be an American citizen. It was an unneutral act in him to assist in collusively procuring a wreck of the prize. The plaintiff has no right to take advantage of such unneutral act. The wreck was within our neutral territory.

Hazard & Robbins, for plaintiff, è contra, contended: (1) That the privateer was regularly commissioned; (2) that the wreck was not procured by collusion; (3) if collusive, still this was no defence. The captures were legal. The wreck, if fraudulent, was by the lawful possessor and owner of the property as prize. The government of Colombia might complain of the act, and enforce a forfeiture against the captors for misconduct by violations of its own laws. But neutrals had nothing to do with such violations. Whether the captors sell rightly or not must be decided in the first instance by the captors themselves, and ultimately, by the courts of their own country. The courts of a neutral coun-

try have no right to meddle with the question of prize, or the sale of prizes, as between belligerents, where their own rights are not violated. Here, the duties were regularly paid, and the goods regularly landed. The captors have done us no wrong. It would be unjust to allow the defendant to pocket these proceeds.

The jury, in pursuance of the direction, of the court, found the facts specially, that the captured vessels and property were Spanish, and captured as enemy's property by the privateer, which was duly commissioned by the government of Colombia; and that the prizes were wrecked by collusion, and previous .concert between the plaintiff and defendant at Key Vaccas, within the territorial jurisdiction of the United States. And subject to these facts, the jury found a verdict for the plaintiffs of $7111.56. The question of law was reserved at the trial; and a motion was subsequently made by Hunter and Searle, for a new trial, which was argued at the last November term by Hunter for the defendant, and by Robbins and Hazard for the plaintiff; and the cause was then continued nisi for advisement. The main ground of argument was the same as relied on at the trial.

STORY, Circuit Justice. There is no longer any question, that the privateer was regularly commissioned, and that the property captured was Spanish, and lawfully taken as prize of war, the republic of Colombia and Spain being at that period and still at war with each other. It is as clear, that the wreck of the prize property was procured by collusion and previous concert between the plaintiff and the defendant, for the very purpose of selling the same within our territorial jurisdiction; and that the bills of exchange were given in consideration of the purchases made of the wrecked goods by the defendant. No fraud has been pretended or proved, upon the municipal or revenue laws of the United States. The goods were regularly landed; the duties on them duly paid or secured; and the sale made at the instance of the captors. The whole defence then turns upon the single point, whether a purchase, made under such circumstances, is such a violation of the law of nations by an American citizen, as infects the whole transaction with the taint of illegality in an American court. There is no statute of our government, which prohibits the sale of prizes in our ports, or that declares wrecks, procured collusively in our ports to evade the rights or duties of foreign belligerent cruisers, civilly or criminally wrong. If such acts be illegal or criminal, that character attaches to them from the principles of the law of nations, which this country is bound to recognize and enforce, as a just assertion of its own neutrality and sovereignty.

No case has been cited, which bears out the argument urged in support of the defence; and ably and even eloquently as it has been pressed upon the court, it proceeds upon reasoning, which admits of great question in every step of its progress. Some principles are extremely clear, and indeed are so well settled, that nothing more is necessary to command approbation, than a simple annunciation of them. Neutral nations are bound equally by their duty and their interest to consider the existing state of things between belligerents as rightful. The right of capture by the law of war cannot be disputed, and the lawfulness of the possession thereby acquired cannot be inquired into by the tribunals of a neutral nation, with the single exception of cases, where the capture itself is an infringement of the jurisdiction or rights of the neutral nation itself. In all other cases, the question of prize or no prize exclusively belongs to the cognizance of the courts of the capturing power. The possession of the captors is to be deemed a possession bonae fidei, and inviolable; and as was said by the supreme court in the case of The Mary Ford, 3 Dall. [3 U. S.] 188, 198, immediately upon the capture the captors acquire such a right as no neutral nation can justly impugn or destroy. The Josefa Segunda, 5 Wheat. [18 U. S.] 338, 357. The original ownership of the enemy is entirely devested by the capture; and though a title, good against all the world, may not be conveyed to a neutral vendee by the captors, unless there be a regular condemnation as prize, or a treaty of peace, which confirms, by implication, the existing title and state of things; yet this does not interfere with the general right of the captors to sell the property, or dispose of it as rightful proprietors jure belli, and possessors de facto. If they act in disobedience to the rules prescribed by their own sovereign, they may be personally responsible to him for their misconduct, and justly incur a forfeiture of the rights of prize. But that is a question altogether between the captors and their sovereign, and no neutral nation has either the authority or duty imposed upon it to take cognizance of, or punish civilly or criminally any such misconduct, or any irregularities, or even wanton wrongs of the captors, not invading its own neutrality. Even in cases of the violation of neutral jurisdiction the tribunals of the injured country content themselves with a simple restitution of the property brought within its territory, and do not interfere to give damages, or inquire into the manner, in which the belligerent may have exercised his power, however harshly, upon the conquered. Strictly speaking, there can be no such thing as a marine tort between belligerents; and at all events, neutral nations have no authority to entertain any judicial cognizance of them. See La Amistad de Rues, 5 Wheat. [18 U. S.] 385. They must be redressed, if at all, by the sovereign, to whom,

as subjects bearing his commission, the captors are responsible for every abuse of their power.

This court, upon these principles, is bound to disclaim any right to control the captors in the management and sale of their prizes. The capture was lawfully made in war between belligerents, recognized by our own government. It must be deemed rightful. Whether the property was ever carried into a proper port for adjudication or not, or properly condemned or not, and whether the captors have been guilty of a fraudulent breach of their duty to their own sovereign or not, are questions, upon which we have not the slightest right to pass judgment. Spain has no right to complain of any extent of the exercise of belligerent power on the part of her enemy. The captors had a plenary dominion over the property by the capture, and might, so far as she was concerned, have burnt it, or destroyed it, or disposed of it in any other manner, which they pleased. If, indeed, by recapture or otherwise it had again come within her reach, it would have been a very different question, whether, under the law of postliminy (see 2 Wheat. [15 U. S.] Append. p. 40; The Flad Oyen, 1 C. Rob. Adm. 135; The Cosmopolite, 3 C. Rob. Adm. 333), she would have acknowledged the validity of the title of a neutral vendee, acquired by a fraudulent effort to escape from her reach, when the property had never been subjected to condemnation by a regular prize tribunal. If, under such circumstances, her courts should have chosen to restore it to the original owners, and dispossess the neutral vendee, he at least would have had no just ground of complaint, for he took his title with his eyes open, and knew and assisted in the device. Nor could he have had any just right of compensation from the captors, because he bought the title with all its infirmities, and if there was any fraud, it was not upon him, or his rights acquired by the purchase.

Was there, then, in the present case any violation of our neutrality? It has not been asserted, that captors violate our neutrality by the mere sale of their prizes in our ports. In general, neutral nations allow them an asylum in their ports. They may, indeed, prohibit their entry into their ports, or the sale of their prizes there, from motives of policy or public convenience. But unless they do so, where is the principle of the law of nations, which prohibits such a sale? I cannot find any such principle laid down in the most approved elementary writers, or justified by the general practice of nations. It is one of those points, which every neutral nation arranges according to its own sound discretion and policy. It is free to refuse, or grant it. If there be no prohibition, the right to sell arises silently from the general operations of commercial intercourse. A bonâ fide possessor of property may traffic with it in every country, where the sovereign does not choose to establish a different rule. The permission results necessarily by implication from the omission of any interdicting expression of the sovereign's pleasure. Unless I have greatly misconceived the general result of the doctrines advanced on this subject by jurists of high character, that is their settled conclusion. See Grotius, bk. 3, c. 9, § 14, and Barbeyrac's note; Vattel, Law Nat. lib. 3, c. 7, § 132; Bynk. c. 15 (Duponceau Ed. pp. 113, 120); D'Abreu Traité sur les Prises, pt. 2, c. 2, §§ 3, 5–7, and Bonnemant's note; Id. pt. 1, c. 3, § 2; Valin, Traité des Prises, c. 7, and particularly section 24, and 2 Valin, Comm.; Ord. de la Mar. arts. 14, 15, pp. 272, 273, etc.; Wheat. Mar. Capt. c. 9, p. 260, § 6; Lee, Capt. p. 193, c. 16; Findlay v. The William [Case No. 4,790]; Consul of Spain v. Consul of Great Britain [Id. 3,138]. I am aware, that at an early period, in one of the circuit courts, a modification of this doctrine was insisted on, viz. that the permission of the government must be express, and could not be implied. That modification has not, to my knowledge, received elsewhere any recognition. I feel myself constrained to doubt, whether it can be supported upon the footing of the law of nations. Perfect neutrality is entirely consistent with allowing the sale of prizes in our ports in the most ample manner, if it be equally granted to all the belligerents. The only just ground of complaint in such cases would be, that, what is allowed to the one, is denied to the other. Many acts of a far more direct operation upon the success of war are not deemed unneutral, where they are granted with sincerity to all the belligerents; for equality, in such cases, is not only in a liberal sense equity, but is neutrality. Permission to sell prizes in our ports may sometimes involve the dangers of fraud, and even of piracy; but mere danger of such consequences does not establish the fact, that a prohibition is created by the law of nations, or that a positive act of the government is required to remove it. If, then, the sale of prizes in a neutral port is not prohibited by the law of nations, what is there in the present case to taint the present transaction with illegality? No fraud has been practised upon our government or our laws. The fraud, if any, was a fraud either to evade the regulations of prize of the republic of Colombia, which we are not called upon to enforce, or the chances of recapture by Spanish cruisers, which we are as little called upon to aid. The wreck of the prize property did not disturb the operation of our revenue laws, or infract our police. The duties have been duly paid; and the custom-house regulations have been sufficiently obeyed. An American citizen now calls upon the court to enable him to pocket the proceeds of the prize, which he has purchased with a full knowledge of all the circumstances, and a full participation in all the intermediate acts, not because he has sustained

any loss, or is willing to restore those proceeds, but because he has aided the captors in a fraud, which touches the sovereign rights of Colombia, or Spain, or both. It appears to me, that an American court has no authority to intermeddle in such controversies. The title to the property was regularly acquired by the captors; they have sold that property to the defendant; he has had possession of the proceeds. There is no moral wrong in compelling him to pay the consideration of the purchase. Our judgment will not touch in the slightest degree the authority of either sovereign to seek his own redress for any wrong done to him in these proceedings. The law of nations has not pronounced a title so acquired to be an absolute nullity; and it has been long settled, that our tribunals do not sit to enforce the mere municipal regulations, or vindicate the injured sovereignty, of foreign nations. For aught that we know, a proper sentence of condemnation may already have passed on this property. It may hereafter be passed by the prize courts of the government of Colombia; for a sale of prizes, however irregular before condemnation, is such a proceeding as does not oust the prize jurisdiction; but the proper court may still in its discretion interfere, and confirm the title by its definitive sentence of condemnation. See The L'Eole, 6 C. Rob. Adm. 220, 224; The La Dame Cecile, Id. 257, 260; The Falcon, Id. 194, 200; The Arabella [Case No. 501].

It has been said, that our law upon general principles prohibits a citizen from colluding with foreigners to procure a wreck. If by this is meant a wreck, which is a fraud upon the laws or rights of our government, or upon the private rights of property of our citizens, the doctrine may be admitted; but its application to the facts of the present case is not perceived. Here, the captors were the owners and possessors of the property; and it will scarcely be pretended, that a wreck, procured by the connivance and consent of the owner, and not intended to cheat or defraud any third person, but merely to escape belligerent risks, falls exactly under the like considerations. Upon the whole, my opinion is, that the verdict is right, and that judgment ought to pass against the defendant.